**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 15-87 |
| | ) | Judge Nora Barry Fischer |
| LANCE GARDENHIRE, GEMERE BEY, | ) | |
| CHRISTOPHER BRADLEY-BEY, | ) | |
| HOLMAN BROWN, HAKEEM DUELL | ) | |
| LASEAN GARDENHIRE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### I.  INTRODUCTION

This multi-defendant heroin trafficking conspiracy case is set for jury selection and trial to commence on April 24, 2017 at 9:30 a.m.  Presently before the Court are pretrial motions to suppress evidence filed by Lance Gardenhire, Gemere Bey, and Christopher Bradley-Bey. (Docket Nos. 1829 (Gardenhire); 1986 (Bey); 1877 (Bradley-Bey)). Each of these Defendants moves to suppress evidence seized from their respective properties under search warrants issued on May 19, 2015.  (*Id.*).  Lasean Gardenhire has joined her husband's motion to suppress evidence seized under a search warrant of their residence at 405 Zara Street.  (Docket No. 2011). Separately, Bradley-Bey moves to suppress the communications intercepted under Title III authorizations and this motion has been joined by several of the remaining defendants, including Lance Gardenhire, Gemere Bey, Holman Brown, Hakeem Duell, and Lasean Gardenhire.[1]

---

[1]     The Court notes that Gemere Bey has joined this motion although he alleges that his communications were not intercepted over the Title III wiretaps.  (*See e.g.*, Docket No. 2066).  The Court further notes that this decision is equally applicable to any of the remaining defendants, including those individuals who did not file an explicit motion for joinder, i.e., Christopher Brown, Corey Cheatom, Anthony Cosby, Khryee Gardenhire and Kevin Scott. The Court has separately denied two pretrial motions filed by Khyree Gardenhire and made several other rulings in

(Docket Nos. 1879 (Bradley-Bey); 2011 (joinder order)).  The Government opposes the suppression motions.  (Docket Nos. 1953, 2007).  Bradley-Bey has filed a Reply, (Docket No. 2000), and the Government filed a Sur-Reply, (Docket No. 2007).  Finally, Gemere Bey filed a motion for a *Franks* hearing on March 10, 2017, (Docket No. 2066), and the Government filed its response to same on March 24, 2017, (Docket No. 2088).  As the motions are fully briefed,[2] they are now ripe for disposition.  For the following reasons, the suppression motions [1829], [1986], [1877], and [1879] and the motion for a *Franks* hearing [2066] are DENIED.

## II.     RELEVANT BACKGROUND

This case is the result of a Drug Enforcement Administration ("DEA") investigation into interstate heroin trafficking by a number of individuals in the Pittsburgh neighborhoods of Beltzhoover, Knoxville, Arlington and Allentown which was allegedly headed by lead defendant Lance Gardenhire and other members of the "Zhoove" gang.  (*See* Docket No. 1953).  The investigative methods utilized by law enforcement included, among other things, Title III authorized interceptions; search warrants; visual surveillance; traffic stops and arrests of certain defendants; and controlled purchases of heroin from certain defendants.  *See United States v. Atkins*, Crim. No. 15-87, 2015 WL 4920831, at *1 (W.D. Pa. Aug. 15, 2015).  The investigation resulted in the indictment of at least 39 individuals for drug trafficking and related offenses at Criminal Numbers 15-87, 16-18 and 16-19.  *See generally* Crim. Nos. 15-87; 16-18; 16-19.  Twenty-five of these individuals have pled guilty to criminal charges and two additional

---

this matter.  (*See* Docket Nos. 1995 (denying Lance Gardenhire amended motion to suppress); 2004 (denying hearing on suppression motions, aside from one filed by Khyree Gardenhire); 2011 (ruling on various pretrial motions); 2021 (denying Khyree Gardenhire's motion to dismiss); 2064 (denying motions to sever, without prejudice); 2080 (denying Khyree Gardenhire's motion to suppress); 2087 (denying motions in limine, without prejudice)).

[2]      The Court ruled that the suppression motions would be decided upon the briefs because the defendants had not demonstrated a right to an evidentiary hearing.  (Docket No. 2004).  For the reasons discussed below, the same is true for the motions filed by Gemere Bey.

defendants are scheduled to change their pleas in the near future.[3]  *Id.*  At this time, there are 11 defendants remaining for trial which, as noted, is scheduled to commence with jury selection on April 24, 2017 at 9:30 a.m.

As the Government recounts:

> The investigation of the Gardenhire Organization involved the interception of 12 cell phones used by Cody Duncan, Corey Cheatom, Anthony Cosby, Juan Wysong, and Christopher Brown (and others at times). These 12 cell phones were referred to in the applications as Target Telephones/TT's 1-4 and 6-13 (there was no TT5). Authorization to intercept calls and text messages over the 12 cell phones was received via 9 applications between November 2014 and April 2015. The applications are sealed and docketed at Miscellaneous Numbers 14-523 and 14-523(A)-(H).

(Docket No. 1953 at 33).  The materials supporting the applications are extensive, consisting of hundreds of pages of documents.  In the corresponding Orders, the presiding judicial officers, the Hon. Arthur J. Schwab and the Hon. Mark R. Hornak, found upon approving each application, among other things, that there was probable cause to believe that the target subjects were involved in felony drug trafficking offenses and money laundering; probable cause that the requested interceptions of wire and electronic communications would intercept communications between those individuals regarding such offenses; and, that it was "adequately demonstrated that normal investigative procedures have been tried and failed to achieve the goal of the investigation, reasonably appear unlikely to succeed if continued or attempted, or are too dangerous to attempt."  (Misc. No. 14-523, Order of 11/5/14 at ¶¶ 2-5).  In addition to the wire taps, there was a pole camera situated on Industry Street from October 2014 to around April 2015 and was focused on the residences at 15 and 17 Industry Street, which were two of the Organization's primary "stash houses" for narcotics.  (Docket No. 1953 at 83, n.6).

---

[3]     The Court notes that the Government voluntarily dismissed charges that were initially brought against Corey Singleton.

The information contained within the affidavits also sets forth in detail the multiple arrests, seizures and interdictions by law enforcement that took place during this investigation. In this regard, on August 2, 2014, Rashod Clark was arrested in Luzerne County, Pennsylvania, and a search of the automobile that he was driving westbound on Interstate 80 "revealed approximately 2,400 bricks of heroin inside a large suitcase." (Misc. No. 14-523, *Affidavit 11/5/14* at 10-11). It is noted that cellular telephones were seized from Clark and that he had communications with a device used by Lance Gardenhire but that he (Gardenhire) changed his number after Clark was arrested. (*Id.* at 11-12). There were several controlled purchases of heroin from coconspirators during 2014, including controlled purchases from Cody Duncan on October 21, and October 29, 2014. (*Id.* at 25-30). The materials make clear that Cody Duncan used what became "target telephone 1" or TT#1 when setting up these deals. (*Id.*).

To summarize, under the Title III authorizations, the Government intercepted a significant volume of calls and text messages between the target individuals that its agents believe involve discussions of narcotics trafficking and that the Government intends to present at trial of this matter. (*See e.g.*, Misc. Nos. 14-523; 14-523A; 14-523B; 14-523C; 14-523D; 14-523E; 14-523F; 14-523G; and 14-523H). As noted, the initial Order authorized the interception of a telephone number associated with Cody Duncan, TT#1 from November 5, 2014 through December 4, 2014. *See* Misc. No. 14-523. The subsequent applications involved the following:

- Misc. No. 14-523A – authorized the interception of TT#2 used by Cody Duncan, from November 14, 2014 through December 13, 2014;
- Misc. No. 14-523B – extended the interceptions of TT#2 and authorized the interceptions of TT#3 used by Cody Duncan, and TT#4 used by Corey Cheatom from November 24, 2014 to December 23, 2014;
- Misc. No. 14-523C – extended the interception of TT#4 and authorized the interception of TT#6 used by Anthony Cosby, and

TT#7 used by Juan Wysong, from December 16, 2014 to January 14, 2015;

- Misc. No. 14-523D – extended the interception of TT#7 and initiated the interception of TT#8 used by Juan Wysong, from January 9, 2015 to February 7, 2015;
- Misc. No. 523E – extended the interception of TT#7 and initiated the interception of TT#9 used by Juan Wysong and TT#10 used by Chris Brown, from January 29, 2015 to February 28, 2015;
- Misc. No. 14-523F – extended the interception of TT#7 and TT#10 and initiated the interception of TT#11 used by Juan Wysong, from February 14, 2015 to March 15, 2015;
- Misc. No. 14-523G – authorized the interception of TT#12 used by Chris Brown, from March 18, 2015 to April 16, 2015; and,
- Misc. No. 14-523H – authorized the interception of TT#13 used by Anthony Cosby, from April 6, 2015 to May 5, 2015.

(*See generally*, Misc. No. 14-523H, Affidavit at 4, 41-44). Each application is supported by an affidavit by DEA Task Force Officer and City of Pittsburgh Bureau of Police Narcotics Detective Eric Harpster. (*Id.*). As is generally the case in these types of investigative materials, the subsequent affidavits build on the earlier ones, providing additional information obtained from the intercepted communications pursuant to the prior applications as support for the requested extension or initiation of intercepts on a new phone. (*Id.*).

The grand jury returned a sealed multi-count indictment against numerous defendants on April 28, 2015. (Docket No. 3). While the indictment remained sealed, the investigation into the Lance Gardenhire Drug Trafficking Organization continued. On May 18, 2015, arrest warrants were issued by United States Magistrate Judge Cynthia Reed Eddy against the individuals charged in the Indictment. (Docket No. 6). Thereafter, the Government applied for and Magistrate Judge Eddy issued search and seizure warrants on May 19, 2015 with respect to 10 Pittsburgh area residences;[4] 12 vehicles; and thousands of dollars in United States currency

---

[4]      A second search warrant was obtained regarding a property at 304 Kathleen Street, which was identified as the residence of Cody Duncan. (*See* Docket No. 1953-2). This search warrant is no longer at issue because Duncan is scheduled for a change-of-plea hearing on April 3, 2017 and as a result of same, the Court denied his motion to suppress, as moot.

which was seized from coconspirators during the course of its investigation. (Govt. Ex. 2, Docket No. 1953-1). Amongst these properties, the warrants authorized the searches of: 405 Zara Street, Lance Gardenhire's residence; 190 and 192 Boggston Avenue, both owned by Gemere Bey; and 57 Climax Street, the residence of Christopher Bradley-Bey.

The warrants were supported by the lengthy and detailed Affidavit of Special Agent Michael Johns of the DEA. (*Id.*). At the outset, Special Agent Johns provides information he has learned throughout his experience investigating narcotics cases and the places where those involved in drug trafficking and firearms offenses typically store drugs, drug proceeds and other evidence of same, including on cell phones, and within residences. (*Id.* at 3-18). He explains the nature and scope of heroin trafficking by the Lance Gardenhire Drug Trafficking Organization, in that its members had distributed thousands of bricks of heroin in Western Pennsylvania during the period of 2014 and 2015 and the investigative methods that had been utilized to obtain such evidence. (*Id.* at 4-6). Special Agent Johns avers that the members of the organization have been involved in violations of federal narcotics, firearms and money laundering offenses and that on April 28, 2015, a federal grand jury returned an indictment charging a number of individuals with heroin trafficking from January 2014 through April 2015 and related firearms offenses, including, among others, Lance Gardenhire, Chris Bradley-Bey and Gemere Bey. (*Id.* at 5). He then details the information supporting the search of each of the properties, including: 405 Zara Street, (*id.* at 22-35); 190 and 192 Boggston Avenue, (*id.* at 54-67); and 57 Climax Street, (*id.*).

The arrest and search and seizure warrants were then simultaneously executed on the morning of May 21, 2015. Relevant here, Lance Gardenhire was arrested at 405 Zara Street. (Docket No. 1953 at 83). According to the inventory return, the search of 405 Zara Street resulted in the seizure of: an Apple iPhone; Samsung/Verizon phone; indicia; and stamp bags of

heroin. *See* Misc. No. 15-mj-463, Docket No. 7. The Government also seized several vehicles that were registered to Lance Gardenhire or his wife, Lasean, including a 2008 Infiniti; 2008 Mercedes Benz; 2005 Mercedes Benz; 2009 Mercedes Benz; and a 2007 Nissan Titan. (Govt. Ex. 2; Docket No. 1953-1 at 56-57).

A few blocks away, Gemere Bey was arrested at 190 Boggston Avenue. (Docket No. 2005). Gemere Bey made incriminating statements to agents upon his arrest, admitting that he had flushed several bundles of heroin down the toilet upon their forced entry into the residence. (*Id.* at 6-7). During the search of 190 Boggston, the police seized: a bottle of oxycodone pills; two separate quantities of heroin; two cellular telephones; and a fully loaded FN pistol. (*Id.* at 7). At Gemere Bey's adjacent property at 192 Boggston, the following evidence was seized:

> [A] quantity of heroin; a heat sealer with bags and a box for bags; six boxes of white glassine bags; cutting agents (specifically two bottles of Inositol and one bottle of Vitamin C); heroin packing paraphernalia such as stampers, tape, scissors, rubber bands, baggies, and face masks; a digital scale; a glass mixing bowl and a strainer; indicia for Gemere Bey; and two FN pistol magazines, caliber 5.7x28, with twenty blue-tipped bullets.

(Docket No. 2005 at 6). The Government proffers that the bullets found in 192 Boggston match the FN firearm that was seized from 190 Boggston and that Gemere Bey owned at the time. (*Id.*). During his discussion with the officers, Gemere Bey implicated his brother, Christopher, when discussing the seizure of evidence from 192 Boggston. (*Id.*).

Christopher Bradley-Bey was arrested at 57 Climax Street, and that property was also searched. (Docket No. 1953 at 45). The evidence seized from Bradley-Bey included an "FN pistol, his cell phone, his Acura car, a relatively small amount of heroin in a baggie, unfilled stamp bags marked with a blue lady bug, small rubber bands, clear plastic baggies, and a large

box of loose marijuana." (*Id.*). The warrant separately authorized the seizure of his Acura Vehicle. (*Id.*).

While this case was pending, both Gemere Bey and Christopher Bradley-Bey filed motions challenging the orders of detention issued in their respective cases. *See United States v. Bey*, Crim. No. 15-87, 2015 WL 7176340, (W.D. Pa. Nov. 13, 2015); *United States v. Bradley-Bey*, Crim. No. 15-87, 2015 WL 7176273 (W.D. Pa. Nov. 13, 2015). In the context of that litigation, the Government presented the affidavit of Special Agent Johns referenced herein. *Id.* The Court, when ruling on those motions, made certain findings relevant to the affidavit, rejected their arguments for release on bail and denied the motions. *Id.* Gemere Bey later sought reconsideration of the Court's Order, which was also denied, 2016 WL 5121760, and his appeal to the United States Court of Appeals for the Third Circuit was likewise denied. *See* Appeal No. 16-3804 (3d Cir. Oct. 27, 2016).

The grand jury issued a Superseding Indictment on February 2, 2016. Among other things, the Superseding Indictment amended the period of the conspiracy to distribute 1 kilogram of heroin charged in violation of 21 U.S.C. § 846 at Count 1, extending it to "from in and around March 2012 to on or about May 21, 2015." (Docket No. 1020). In addition, the money laundering charge at Count 3 against Lance Gardenhire was amended to add his wife, Lasean, as a defendant, and the charge became money laundering conspiracy, in violation of 18 U.S.C. § 1956(h). (*Id.*). This is the only charge against Lasean Gardenhire, which includes as a possible penalty a term of incarceration of up to 20 years. (Docket No. 1021).

Aside from Lasean Gardenhire, all of the remaining Defendants, (i.e., Lance Gardenhire; Gemere Bey; Christopher Bradley-Bey; Christopher Brown; Holman Brown; Corey Cheatom; Anthony Cosby; Hakeem Duell; Khyree Gardenhire; and Kevin Scott), are charged at Count 1

with conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin in violation of 21 U.S.C. § 846. (Docket No. 1020). Lance Gardenhire, his son, Khyree and Corey Cheatom are charged at Count 2 with one count of attempt to possess with intent to distribute 1 kilogram or more of heroin in violation of 21 U.S.C. § 846. (*Id.*). Given the quantity of heroin, the potential penalties for these offenses generally include a mandatory minimum term of 10 years' incarceration and up to life imprisonment. (Docket No. 1021). However, the Government filed a Section 851 Information against both Lance Gardenhire and Cheatom, the result of which would increase the potential penalties to a mandatory term of incarceration of 20 years and up to a life term. (Docket Nos. 2071 (Cheatom); 2072 (Lance Gardenhire)).

A number of the remaining defendants are charged with possession of a firearm in furtherance of a drug trafficking offense or brandishing a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c): Lance Gardenhire (Count 7); Gemere Bey (Count 16); Christopher Bradley-Bey (Count 15); Christopher Brown (Count 12); Holman Brown (Count 14); Corey Cheatom (Count 8); Anthony Cosby (Count 10); Hakeem Duell (Count 19); and Kevin Scott (Count 18). (Docket No. 1020). Upon a conviction of these firearm offenses, the penalties will include a term of incarceration of not less than 7 years and up to life, consecutive to any other term of imprisonment. (Docket No. 1021).

Corey Cheatom (Count 21); Hakeem Duell (Count 23); and Kevin Scott (Count 22), are each charged with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Docket No. 1020). If convicted, they face a term of incarceration of up to 10 years; however, if they have three prior violent felony convictions or serious drug offenses, pursuant to 18 U.S.C. § 924(e), they could be subject to a term of incarceration of not less than 15 years and up to life imprisonment. (Docket No. 1021).

There are also several charges of possession with intent to distribute and/or distribution of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), including: Gemere Bey, (Count 51); Christopher Bradley-Bey (Count 52); Christopher Brown (Count 53); Holman Brown (Count 53); Anthony Cosby (Counts 28-31, 54); Hakeem Duell (Count 47); and, Khyree Gardenhire (Count 49). The possible penalty for these violations is up to 20 years' imprisonment. (Docket No. 1021). Finally, Kevin Scott is charged with possession with intent to distribute and/or distribution of 100 grams or more of heroin in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i) and is subject to a mandatory minimum penalty of 5 years' incarceration and up to 40 years' incarceration for such offense. (Docket Nos. 1020; 1021).

III.    MOTION TO SUPPRESS TITLE III INTERCEPTS

The Court first turns to the motion to suppress filed by Bradley-Bey challenging the Title III intercepts. (Docket No. 1879). In his 6-page motion, Bradley-Bey alleges that his telephone conversations were intercepted pursuant to 2 of the 9 wiretap authorizations.[5] (*Id.*). He then makes three primary arguments in support of his suppression motion: (1) that there was not sufficient probable cause to authorize the interceptions; (2) that the "necessity" provisions of Title III were not adhered to as normal investigative procedures were not fully utilized prior to obtaining the authorizations; and, (3) that the intercepted calls were not properly minimized, as required by the statute. (*Id.*). Although a number of co-defendants have joined this motion, they have not submitted briefs or otherwise further advanced these arguments. In opposition, the Government generally contends that Bradley-Bey's arguments are "undeveloped" or

---

[5]    Bradley-Bey further notes in his Reply that his conversations were intercepted on three of the target telephones and that his calls were only recorded on approximately 13 separate occasions. (Docket No. 2000). He admits that during 2 of the calls in February of 2015, he related information about the presence of law enforcement officers to Chris Brown. (*Id.*). He claims that "not a single one of [the 13 recorded calls] was about selling drugs, transporting drugs, delivering drugs, quality of drugs, weight of drugs, hiding drugs, receiving money, delivering money, hiding money or anything at all related to drug trafficking." (*Id.*).

"underdeveloped" and although his position pertains specifically only to the two authorizations under which his telephone calls were intercepted, the Government proceeds to evaluate the sufficiency of each of the 9 separate applications. (Docket No. 1953). For the following reasons, and consistent with this Court's decision in *United States v. Ewell*, Crim. No. 13-125, 2016 WL 463784, at *11 (W.D. Pa. Feb. 8, 2016), addressing many of these same types of issues, the motion to suppress the Title III intercepts is denied.

a. *Legal Standard*

Pursuant to Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 et seq., wire, oral, and electronic communications may be intercepted by law enforcement on a showing that there is probable cause that (1) an individual is committing a particular offense; (2) that relevant communications will be obtained through the interception; and (3) that the premises where the interception will be made are being used in connection with the charged offense. 18 U.S.C. § 2518(3). In addition, a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(1)(c). Thus, in order to lawfully grant an application for a wiretap, the issuing judge must find a wiretap to be necessary, which requires that the application explain why "normal investigative techniques would be of no avail." *United States v. Hendricks*, 395 F.3d 173, 180 (3d Cir. 2005) (internal quotation marks and citation omitted).

*United States v. Garvey*, 588 F. App'x 184, 190 (3d Cir. 2014). "When a warrant is later challenged, a deferential standard of review is applied in determining whether the issuing judge had a 'substantial basis' for issuing the warrant." *United States v. Gilliam*, No. 02:12-CR-93, 2015 WL 5178197, at *14 (W.D. Pa. Sept. 4, 2015) (citing *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir.1993); *Illinois v. Gates*, 462 U.S. 213, 237 (1983)). Further, when a motion challenges the four corners of an affidavit and application, an evidentiary hearing is not required. *Id.* at *14.

The Court of Appeals has made clear that "18 U.S.C. § 2518(3)(c) does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir. 1997); *see also United States v. Rivera*, 532 F. App'x 304 (3d Cir. 2013) (quoting same).

> "The government need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir.) (quoting *United States v. Armocida*, 515 F.2d 29, 38 (3d Cir.), *cert. denied sub nom., Conti v. United States*, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975)); *cert. denied sub nom., Hauser v. United States*, 506 U.S. 956, 113 S.Ct. 415, 121 L.Ed.2d 339 (1992). Furthermore, in determining whether this requirement has been satisfied, a court "may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *United States v. Ashley*, 876 F.2d 1069, 1072 (1st Cir. 1989); *see also United States v. Landmesser*, 553 F.2d 17, 20 (6th Cir.), *cert. denied*, 434 U.S. 855, 98 S.Ct. 174, 54 L.Ed.2d 126 (1977). "The government's showing is to be 'tested in a practical and commonsense fashion.'" *McGlory*, 968 F.2d at 345 (quoting *United States v. Vento*, 533 F.2d 838, 849 (3d Cir.1976))

*Williams*, 124 F.3d at 418.

The Government is also required to minimize the intercepted communications pursuant to 18 U.S.C. § 2518(5), which states:

> Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.

The Court of Appeals has long held that "[s]ection 2518(5) does not prohibit the interception of all non-pertinent conversations; rather it requires the government to conduct the wiretap so as to minimize the interception of such calls. The minimization standard is one of the reasonableness of a particular interception, which is to be ascertained on a case-by-case analysis." *United States*

*v. Armocida*, 515 F.2d 29, 42 (3d Cir. 1975); *see United States v. Hull*, 456 F.3d 133, 142-43 (3d Cir. 2006) ("Our inquiry is on the 'reasonableness' of minimization efforts, under the totality of the circumstances."). When general allegations are made, all that is required is a showing that a good faith effort to minimize was attempted. *Id.* at 44. Further, "when investigating a wide-ranging conspiracy between parties known for their penchant for secrecy, broader interceptions may be warranted" and "[t]he mere *number* of intercepted, but non-pertinent, calls is not dispositive." *Hull*, 456 F.3d at 143 (emphasis in original).

     *b. Discussion*

     After careful consideration of the parties' positions, it is this Court's opinion that Bradley-Bey and his codefendants have failed to demonstrate that the Title III interceptions should be suppressed under the prevailing law governing same.[6] The Court briefly explains its rationale for these decisions.

     Initially, the Court holds that the judicial findings of probable cause and that the utilization of the wiretaps were necessary under 18 U.S.C. § 2518 by her colleagues are entitled to deference and otherwise have not been undermined by the Defendants' cursory objections. *See Gilliam*, 2015 WL 5178197, at *14. To this end, Defendants rely upon bald assertions that the necessity prong has not been met and that other investigative techniques could have been utilized by the law enforcement officers investigating this case rather than resorting to the Title III interceptions. (Docket No. 1879). However, the Government is simply not required to exhaust all potential investigative methods before obtaining a wiretap. *See Williams*, 124 F.3d at 418. The Court of Appeals recently addressed this issue rather succinctly:

---

[6]     The Court granted Bradley-Bey leave to file a *nunc pro tunc* motion to suppress raising additional theories challenging the February 14, 2015 Title III application. However, counsel advised on March 10, 2017 that "after having had additional time to further research the issue, review the applications, and discuss the matter with the defendant, counsel wishes to advise the Court the defense will not be submitting the motion." (Docket No. 2063 at 2).

> [E]ven where normal investigative techniques might have been
> sufficient to implicate the conspiracy leader in drug trafficking,
> such approaches are sometimes insufficient to determine the scope
> of the conspiracy or the nature of the conspiracy leader's on-going
> criminal activity. . . . In the proper circumstances, the
> instrumentalities of Title III may be employed to discover the full
> extent of crimes and conspiracies.

*United States v. Bailey*, 840 F.3d 99, 116 (3d Cir. 2016). Further, as the Government points out,

each of the applications contains an extensive explanation of the expansive nature of the

investigation and its purpose to dismantle the entire Gardenhire Drug Trafficking Organization,

and to determine the identities of all of the coconspirators, including out of state suppliers; and to

obtain evidence to prove the case against the members for violations of federal statutes beyond a

reasonable doubt; outlines the investigative methods that had been utilized up until that point in

time; and details the alternative investigative methods that were considered but not used due to

several factors, including the violent behavior of the members of the organization. (*See* Docket

No. 1953 at 33-38).

Upon reviewing each application, the presiding Judicial Officers, i.e., Judges Schwab and

Hornak, approved the Title III interceptions, and expressly found that the methods met the

requirements of 18 U.S.C. § 2518(c)(3) to show the necessity of the applications. (*See, e.g.*,

Misc. No. 14-523, Order of 11/5/14 at ¶¶ 2-5) (The Government "adequately demonstrated that

normal investigative procedures have been tried and failed to achieve the goal of the

investigation, reasonably appear unlikely to succeed if continued or attempted, or are too

dangerous to attempt."); Docket No. 1953 at 40).[7] These judicial findings are entitled to

---

[7]    According to the Government, the necessity sections in the applications were found at the following page
numbers:

        * Application 14-523 (TT1 initial): pages 22-49
        * Application 14-523(A) (TT2 initial): pages 23-31
        * Application 14-523(B) (TT2 extension & TT's 3-4 initials): pages 29-45
        * Application 14-523(C) (TT4 extension & TT's 6-7 initials): pages 22-40

deference by this Court and it otherwise appears that these decisions were appropriate and consistent with the prevailing law. *See, e.g.*, *Rivera*, 532 F. App'x at 306 ("the utility of other methods of investigation to obtain some information does not foreclose the possibility that a wiretap is necessary to obtain other information."); *Garvey*, 588 F. App'x at 191; *Ewell*, 2016 WL 463784, at *11-15. All told, the Government laid a sufficient factual predicate to justify the necessity of the Title III interceptions. *See McGlory*, 968 F.2d at 345; *Bailey*, 840 F.3d at 116 ("As long as the wiretap affidavit is prepared in detail, recounting the investigative methods that were attempted and why other methods would prove ineffective, as they were here, we have no difficulty concluding that the district court did not abuse its discretion in determining that the affidavit supported a finding of necessity.").

With respect to the challenges to the probable cause findings, Defendants' entire argument is:

> The affidavits in support of the initial and renewal applications contained stale and repetitious information and contained improper legal and factual conclusions and were therefore, insufficient to warrant the initial interception or continued interception of the electronic communications in the above-captioned case.
>
> The subsequent wiretap application contained no materially new information that would provide justification for the re-issuance of the interception order.

(Docket No. 1879). The Government counters by referencing the probable cause portions of the affidavits for each of the particular wiretap applications,[8] arguing that they more than suffice to

---

* Application 14-523(D) (TT7 extension & TT8 initial): pages 24-36
* Application 14-523(E) (TT7 extension & TT's 9-10 initials): pages 26-68
* Application 14-523(F) (TT's 7, 10 extensions & TT11 initial): pages 26-41
* Application 14-523(G) (TT12 initial): pages 22-33
* Application 14-523(H) (TT13 initial): pages 22-34

(Docket No. 1953 at 40).

[8] The Government cites to the following portions of the affidavits:

demonstrate probable cause, or a fair probability that evidence of drug trafficking would be obtained through the intercepted communications. (Docket No. 1953 at 38-40). The Court once again agrees with the Government's position.

In this regard, the presiding judicial officers found probable cause to issue each of the wiretap authorizations, making specific findings that: the named individuals were committing specified federal offenses; there was probable cause to conclude that the interception of wire and electronic communications would reveal discussions of the offenses, identify participants, and locations where the offenses were being committed; and, the target telephones were still being used. (*See, e.g.*, Misc. No. 14-523, Order at ¶¶ 1-5). Hence, all of the requisite findings under 18 U.S.C. § 2518(3) were made in each instance.

Although the Court need not recount every detail set forth in the supporting affidavits, and declines to do so here given the general objection that has been lodged, the Court would note the following. With respect to Defendants' contention that the information was stale in the initial and subsequent applications, the wiretap of Cody Duncan's TT#1 was issued on November 5, 2014, or only one week after he sold heroin to a confidential informant on October 29, 2014, setting up the deal over TT#1 through text messages that were monitored by law enforcement. *See* Misc. No. 14-523 at 29-30. The wiretap of Cody Duncan's TT#2 was issued on November 14, 2014 based upon information that he was communicating with Corey Cheatom regularly on

---

  * Application 14-523 (TT1 initial): pages 22-49
  * Application 14-523(A) (TT2 initial): pages 23-31
  * Application 14-523(B) (TT2 extension & TT's 3-4 initials): pages 29-45
  * Application 14-523(C) (TT4 extension & TT's 6-7 initials): pages 22-40
  * Application 14-523(D) (TT7 extension & TT8 initial): pages 24-36
  * Application 14-523(E) (TT7 extension & TT's 9-10 initials): pages 26-68
  * Application 14-523(F) (TT's 7, 10 extensions & TT11 initial): pages 26-41
  * Application 14-523(G) (TT12 initial): pages 22-33
  * Application 14-523(H) (TT13 initial): pages 22-34

(Docket No. 1953 at 40).

TT#1, with Cheatom being identified by the experienced agent as a high-ranking member of the Organization, who had been arrested on October 30, 2014 for unlawful firearm possession but released on bond. *Id.*; *see also* Misc. No. 14-523A at 10-14. The second wiretap application was timely made because on November 5, 2014, Cody Duncan was overheard discussing that he was at a store purchasing a new phone, TT#2, and a confidential informant verified that he (Cody Duncan) was now using TT#2 as of November 10, 2014, or four days before the wiretap of TT#2 was authorized. *See* Misc. No. 14-523A at 10-14. This is a recitation of only a very small portion of the evidence supporting the affidavits, but such evidence clearly demonstrates that it cannot be considered stale under prevailing precedent. *See e.g.*, *United States v. Gorny*, Crim. No. 13-70, 2014 WL 2860637, at *8 (W.D. Pa. June 23, 2014) ("the Court finds that the information in the affidavit is not stale because a period of <u>two weeks</u> is insufficient to demonstrate staleness and the supposed staleness of the information is but one of the factors which the Court must consider in the totality of the circumstances when reviewing the warrants.") (emphasis added). The subsequent affidavits likewise provide additional information, building on the prior law enforcement investigative efforts with the authorizations being issued very close in time to the activities described therein. *See e.g.*, Misc. Nos. 14-523B:14-523H. Given the lack of a specific objection, no further discussion of same is necessary.

To conclude, after reviewing the totality of the circumstances supporting the Title III applications, the Court overrules the general objection to probable cause and finds that there was a substantial basis for the probable cause findings. *See United States v. Agurs*, 629 F. App'x 288 (3d Cir. 2015) ("Reviewing the affidavit as a whole, we find a substantial basis supporting the finding of probable cause.").

Finally, as to the claimed lack of minimization, neither Bradley-Bey nor his codefendants identify any calls that were allegedly not minimized as is required under 18 U.S.C. § 2518(5). (Docket No. 1879).  At most, Bradley-Bey denies that the 13 recorded calls where he was intercepted involved discussions related to drug trafficking, suggesting that he was just speaking with friends about their common interests such as strip clubs and other things going on in the Beltzhoover neighborhood.  (Docket No. 2000).  However, in situations as in this case, where the Government was authorized to engage in broad wiretapping of numerous communications, and the experienced agents have noted that the targets often spoke in coded language, the Court cannot find that the minimization efforts were unreasonable.  *See, e.g., Hull*, 456 F.3d at 142-43.

### c.  Conclusion

For these reasons, Defendants' Motion seeking to suppress the Title III intercepts [1879] is DENIED.

## IV.  MOTIONS TO SUPPRESS SEARCH WARRANTS

The Court next turns to the motions to suppress search warrants filed by Lance Gardenhire and joined by his wife, Lasean; Gemere Bey; and Bradley-Bey.  (Docket Nos. 1829; The Government opposes the motions to suppress.  (Docket No. 1953).  The prevailing legal standard governing challenges to the sufficiency of search warrants follows.

### a.  Legal Standard

"A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Illinois v. Gates*, 462 U.S. 213, 236 (1983) (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).  A trial court exercises "only a deferential review of the initial probable cause determination made by the magistrate." *United States v. Conley*, 4 F.3d 1200, 1205 (3d Cir. 1993) (citing *Gates*, 462 U.S. at 236) (emphasis in original). "[T]he duty of a

reviewing court is simply to ensure that the magistrate had a 'substantial basis for … conclud[ing]' that probable cause existed." *Gates*, 462 U.S. at 238 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). The deference given to a magistrate's issuance of a warrant "does not mean that reviewing courts should simply rubber stamp a magistrate's conclusions." *United States v. Miknevich*, 638 F.3d 178, 182 (3d Cir. 2011). Still, "the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Jones*, 994 F.2d 1051, 1055 (3d Cir. 1993).

A magistrate's role in issuing a warrant is to "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A warrant is to be upheld on review "as long as there is a substantial basis for a fair probability that evidence will be found." *Conley*, 4 F.3d at 1205. In conducting this assessment, a reviewing court is confined "to the facts that were before the magistrate judge, i.e., the affidavit, and [the court may] not consider information from other portions of the record." *Jones*, 994 F.2d at 1055. Stated otherwise, the District Court is restricted to viewing only the information confined by the "four corners" of the affidavit before the magistrate. *United States v. Whitner*, 219 F.3d 289, 295-96 (3d Cir. 2000). "The supporting affidavit to a search warrant is to be read in its entirety and in a common sense, nontechnical manner." *Miknevich*, 638 F.3d at 182. This includes "all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information." *Gates*, 462 U.S. at 238-39. Further, "probable cause is a fluid concept that turns on the assessment of probabilities in particular factual contexts not readily, or even usefully, reduced to a neat set of legal rules."

*Miknevich*, 638 F.3d at 182 (internal quotations omitted) (quoting *United States v. Shields*, 458 F.3d 269, 277 (3d Cir. 2006)). Proof beyond a reasonable doubt is not required. *Id.*

       *b. Discussion*

The United States Court of Appeals for the Third Circuit has recognized:

> When the crime under investigation is drug distribution, a magistrate may find probable cause to search the target's residence even without direct evidence that contraband will be found there. In a series of cases beginning with *Whitner*, 219 F.3d at 298, we recognized that "evidence associated with drug dealing needs to be stored somewhere, and ... a dealer will have the opportunity to conceal it in his home. After all, a dealer could logically conclude that his residence is the best, and probably the only, location to store items such as records[,] ... cash, ... guns, ... and large quantities of drugs to be sold."

*United States v. Stearn*, 597 F.3d 540, 558 (3d Cir. 2010). However, there must be some demonstrable "nexus" between the drug dealer's home and the crimes committed. *Id.* at 558-59. Prevailing caselaw establishes a number of non-exhaustive factors that may be considered when evaluating probable cause to search, such as,

> large-scale operations, a defendant's attempts to evade officers' questions about his address, the conclusions of experienced officers "regarding where evidence of a crime is likely to be found," the proximity of the defendant's residence to the location of criminal activity, probable cause to arrest the defendant on drug-related charges, and the tip of a "concerned citizen" that a specific stolen item would be found in the defendant's residence.

*Id.* at 559-60 (internal citations and quotations omitted).

Before addressing the probable cause to support the searches of the individual properties, the Court notes that the instant search warrants were issued several weeks after the grand jury returned a sealed indictment against Lance Gardenhire, Gemere Bey and Chris Bradley-Bey but before they were arrested on such charges. It is well-established that the grand jury's return of an indictment establishes probable cause that a crime has been committed. *See Atkins*, 2015 WL

4920831, at *4 (citing *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir. 1986)) ("The grand jury's return of the Indictment suffices to demonstrate probable cause that these offenses were committed."). Here, Special Agent Johns informed United States Magistrate Judge Eddy that on April 28, 2015, a federal grand jury had returned an indictment charging Lance Gardenhire, Gemere Bey and Chris Bradley-Bey with heroin trafficking from January 2014 through April 2015 and related firearms offenses.[9] (Docket No. 1953-1 at 5). Hence, Magistrate Judge Eddy was presented with a warrant to search the residences of these defendants, (and an additional property owned by Gemere Bey), at a time when it was already established that there was probable cause to conclude that they were engaged in heroin trafficking for over a period of nearly 16 months but had yet to be arrested as of May 19, 2015. In that context, the Court examines the probable cause supporting the search locations, in turn.

*1.* 405 Zara Street[10]

With respect to the search of 405 Zara Street, the Gardenhires argue generally that the affidavit lacks probable cause to search that location and specifically, that the affidavit lacked information concerning the reliability of the confidential informant (CS1) who had provided information to investigators as to Lance Gardenhire. (Docket No. 1829). In opposition, the Government contends that these arguments are both factually and legally deficient, pointing to the specific sections of the affidavit, (pages 18-37), where the reliability of CS1 was provided

---

[9]     The Court notes that Lance Gardenhire was also charged with money laundering. (Docket No. 1).

[10]     The Court notes that Gardenhire has not demonstrated that he has a reasonable expectation of privacy in the residences at 15 Industry Street, 17 Industry Street or 2236 Vodeli Street, as he failed to address the Government's position in a reply brief or otherwise. (*See* Docket No. 2004). The record before the Court demonstrates that he lacks an expectation of privacy in these locations. 15 Industry Street is described as the former primary residence of Anthony Cosby and 17 Industry Street is described as the residence of Christopher Brown, Holman Brown and Dale Brown. (Docket No. 1953-1 at 55). The Court has not been provided with the search warrant on the Vodeli Street property. Consistent with the Court's prior ruling, the Gardenhires' motion to suppress is denied to the extent they challenge the searches of these properties.

and the full statement of probable cause to search 405 Zara Street.  (Docket No. 1953).  The Court concurs with the Government on both points.

It is uncontested that 405 Zara Street was Lance and Lasean Gardenhire's primary residence.  (Docket No. 1953-1 at 55).  Moving on, regarding the alleged lack of any information concerning the reliability of a confidential informant, "[a] magistrate may issue a warrant relying primarily or in part upon the statements of a confidential informant, so long as the totality of the circumstances gives rise to probable cause."  *Stearn*, 597 F.3d at 555.  Under the prevailing law, even anonymous tips may be considered, if the investigators can corroborate the information prior to acting on same.  *Id.* at 556 ("'the value of [police] corroboration of details of an informant's tip' as a viable basis for crediting the hearsay tip of a confidential informant.")  (quoting *Gates*, 462 U.S. at 241).  Thus, it is not enough for a defendant to simply argue that the informant lacked reliability or veracity.

In any event, despite Defendants' arguments, the affidavit expressly addresses the reliability and veracity of CS1, stating:

> In September 2014, as well as on several occasions thereafter, agents assigned to the DEA-Pittsburgh District Office interviewed a confidential source referred to herein as "CS1". The interviews were not anonymous – the interviews were often in-person, the interviewing agents were fully aware of CS1's identity, and CS1 did not attempt to obscure his identity in any manner. CS1 agreed to be interviewed with the understanding that the provision of truthful information could result in more favorable charging and/or sentencing treatment relative to prior criminal activity. CS1 has a significant criminal history that has resulted in significant imprisonment. The requirement that CS1 provide only truthful information was stressed to CS1 from the beginning.

(*Id.* at 19-20).  Special Agent Johns then recounts the information that was provided by CS1 and the corroboration of same by law enforcement, including the arrest records of Rashod Clark, examination of his phone, controlled buys of heroin from members of the organization,

observations on the pole camera stationed outside of 15 and 17 Industry Street and cell phone toll data information and intercepted communications. (*Id.* at 22). Accordingly, Defendants' objections to the supposed lack of any such information in the affidavit are overruled.

The Court further holds that the totality of the information set forth in the affidavit certainly provided a substantial basis for the issuance of the warrant to search 405 Zara Street and that there was a reasonable probability that contraband would be found at that location. To reiterate, Lance Gardenhire had been indicted by a federal grand jury approximately 3 weeks prior to the issuance of the search warrant for engaging in heroin trafficking over a period of 16 months. The evidence of Lance Gardenhire's large scale drug distribution activities is extensively set forth in the affidavit, but the Court would highlight a few pieces of evidence, which, collectively demonstrate more than a fair probability that law enforcement would find evidence of criminal activity at the Gardenhires' home. To this end, Special Agent Johns recounts:

> In mid-April 2015, CS1 was with GARDENHIRE at the 405 Zara Street location. At that time, CS1 observed that GARDENHIRE was continuing to reside at and remodel the residence. CS1 observed security cameras around the outside of the residence. Additionally, CS1 explained that GARDENHIRE, in April 2015, expressed a desire that CS1 assist GARDENHIRE in distributing narcotics. CS1 explained that GARDENHIRE was distributing narcotics from the 405 Zara Street location in April 2015 during the time period when CS1 was at that location.

(Docket No. 1953-1 at 86). In short, a known confidential informant provided information that Lance Gardenhire had been distributing narcotics from 405 Zara Street as recently as April of 2015, creating a sufficient link between the location of the search and the criminal offenses with which he was charged. *See Stearn*, 597 F.3d at 559-60. Further, the experienced agent shared his opinion that evidence of narcotics trafficking, firearms offenses and money laundering would be

found there, particularly given the security of the premises and other information showing that Lance Gardenhire was aware of potential surveillance and took actions to conceal his activities. In addition, Lance Gardenhire had no job but had made substantial renovations to the property and owned a fleet of high-end vehicles. Therefore, this Court holds that there was a substantial basis for Magistrate Judge Eddy to conclude that there was probable cause to search the residence. *See Gates*, 462 U.S. at 238. Accordingly, the Gardenhires' motion is denied.

### 2. 190 and 192 Boggston Avenue/57 Climax Street

The Court next evaluates the motions to suppress filed by brothers Gemere Bey and Christopher Bradley-Bey together, as they have raised similar arguments and the information supporting the searches of their properties is summarized together in the affidavit. (*See* Docket No. 1953-1 at 54-67). As they did in the context of the detention litigation, both argue that the confidential informant who provided information against them lacks veracity and that the information that he provided was unreliable and too "stale" to justify the searches. (Docket Nos. 1877, 1986, 2000). Gemere Bey adds that there was no direct evidence of drug activity having taken place at his properties on Boggston Avenue and that the good faith exception should not apply. (Docket No. 1986). The Government opposes both motions. (Docket Nos. 1953; 2005). As is explained below, the motions to suppress will be denied.

Following the discussion above, direct evidence of drug trafficking at the locations of the searches is not required in a situation such as this one where Gemere Bey and Christopher Bradley-Bey had been charged with federal narcotics and firearms offenses but were not yet arrested before the search warrant issued. *See Stearn*, 597 F.3d at 558. Rather, the Court must review the affidavit in a "common sense, nontechnical manner," *Miknevich*, 638 F.3d at 182, to determine if there is a sufficient nexus between the locations to be searched and the offenses

charged, *Stearn*, 597 F.3d at 558-59, prior to concluding that there is a fair probability that evidence of the offenses would be found at those locations. Having reviewed the affidavit in its entirety in light of the articulated standards of review, the Court holds that the information contained therein, viewed collectively, demonstrates a fair probability that evidence of the crimes charged would be located at 190 Boggston, 192 Boggston and 57 Climax Street. The Court now turns to their specific arguments.

Like before, this Court finds the Bey brothers' challenges to the reliability and veracity of the confidential informant, CS2, to be unpersuasive and holds that the information provided by this individual was appropriately considered under the totality of the circumstances. *See Stearn*, 597 F.3d at 556. The alleged credibility issues that they raise were specifically listed by Special Agent Johns in the affidavit, including CS2's prior criminal record, immigration status, admissions of criminal conduct, and the fact that this individual was provided money, ($2,500.00), for living expenses. (*See* Docket No. 1953-1 at 57-63). Special Agent Johns then explains, at length, the information that was provided by CS2 and the corroboration of same by the investigators. (*Id.*). For example, the agents reviewed CS2's medical records to confirm that this individual was hospitalized with significant injuries around the time that he told the officers he was tortured in the attic of 190 Boggston. (*Id.*). They also reviewed his text messages around the same time period which indicated that there were problems, (i.e., money and heroin was stolen), leading to that episode. (*Id.*). CS2 also admitted that he was distributing heroin to customers on behalf of the Bey brothers, bolstering his credibility in the eyes of the agent. (*Id.*). In light of the substantial efforts to corroborate the information, the Court finds that consideration of information from CS2 is appropriate. *See Stearn*, 597 F.3d at 556.

On the issue of alleged staleness of the information, the Court of Appeals has held:

> Age of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause may no longer exist. Age alone, however, does not determine staleness ... Rather, we must also examine the nature of the crime and the type of evidence.

*United States v. Zimmerman*, 277 F.3d 426, 434 (3d Cir. 2002) (internal citations omitted). Our court of appeals has not adopted "bright line rules" delineating a length of time to determine staleness. *Id.* at 435. "Additionally, courts have recognized that continued criminal activity in the intervening period undermines a claim of staleness," with this Court finding that an eight-month period of time between a controlled buy and the execution of a search warrant at a drug dealer's residence did not render the information stale, as he was continuing to engage in narcotics trafficking during that period. *Gorny*, 2014 WL 2860637, at *8; *see also United States v. Urban,* 404 F.3d 754, 773 (3d Cir. 2005) ("[W]here the facts adduced to support probable cause describe a course or pattern of ongoing and continuous criminality, the passage of time between the occurrence of the facts set forth in the affidavit and the submission of the affidavit itself loses significance."). These same guiding principles lead the Court to find that the information provided by CS2 to investigators during the meetings in February of 2015 and thereafter, wherein he detailed his drug activities in the summer and fall of 2014 with the Bey brothers, does not render the information in the affidavit stale.

Again, there is probable cause that Gemere Bey and Christopher Bradley-Bey were involved in a conspiracy to traffic heroin for a period of 16 months, starting in January of 2014 and continuing until April of 2015. The affidavit states that they were significant distributors for the Lance Gardenhire Drug Trafficking Organization. They were also indicted for firearms offenses. The Court's inquiry is therefore limited to determining if there is a sufficient nexus between the locations to be searched and the charged criminal activity.

Regarding the warrant to search the property at 57 Climax Street, CS2 told law enforcement that he observed the Bey brothers with hundreds of bricks of heroin and cash at the residence in 2014 and that they paid CS2 to distribute heroin to customers. (Docket No. 1953-1 at 57-62). In October of 2014, at a time when Bradley-Bey was out of town, CS2 met another individual at the home to pick up heroin so that it could be distributed to customers. (*Id.*). The Bey brothers then accused CS2 of stealing heroin and cash from 57 Climax Street and he was subjected to the assault in the attic of 190 Boggston Avenue, during which both Gemere and Christopher possessed firearms and CS2's life was threatened. (*Id.*). CS2 also told investigators that Bradley-Bey hid drugs in his vehicle, which they observed parked outside of his residence and was also seized. (*Id.*). The investigators observed Bradley-Bey in possession of a firearm on the pole camera outside of 15 and 17 Industry Street on more than one occasion. (*Id.* at 57). He was captured on wiretaps in early 2015 warning coconspirators that law enforcement was patrolling their Beltzhoover neighborhood. (*Id.* at 55-56). Most recently, in March of 2015, Bradley-Bey was observed meeting Chris Brown outside of Industry Street during a drug deal, they then walk down the steps toward his brother Gemere's Boggston Avenue properties and later returned with what investigators believed was additional heroin to complete a transaction with another confidential informant. (*Id.* at 64-66). Overall, the totality of the information in the warrant supported the finding of probable cause to search 57 Climax Street (and the Acura vehicle) to find evidence of drug trafficking and firearms offenses. *See Stearn*, 597 F.3d at 558-60.

Similarly, the Court holds that the information provided in the affidavit gave Magistrate Judge Eddy a substantial basis to authorize the searches of Gemere Bey's Boggston Avenue properties in order to find evidence of drug trafficking and firearm offenses as well as any

evidence of the assault that took place in 190 Boggston. It is uncontested that Gemere Bey owns both properties and that they are located next door to each other. (Docket No. 1953-1 at 6, 54). In addition to what is noted above concerning drug trafficking in the summer and fall of 2014, Gemere Bey was pulled over in a traffic stop in November of 2014, and in possession of a firearm, which, as Special Agent Johns notes, is a tool of the drug trade that drug dealers may keep in their homes. (*Id.* at 56). CS2 told the investigators in February of 2015 that Gemere Bey was renovating the properties, which the experienced investigators understood is one way to launder money. CS2 likewise explained that Gemere Bey was living in 190 Boggston and the agents observed him using the residence and saw his van and a female companion outside the residence in 2015. (*Id.* at 56). It was reported that Gemere Bey posted a threat on Facebook in January or February of 2015 and was directed toward individuals who were permitting CS2 to live with them at the time. (*Id.* at 62). Further, the experienced agents determined that in March of 2015, Christopher Bradley-Bey and Chris Brown went to the Boggston properties to obtain additional heroin which was then sold to a confidential informant. (*Id.* at 64-66). Finally, the experienced agent opined that the property was a possible stash house for heroin, proceeds and/or firearms. (*Id.* at 54). Given the totality of these circumstances, there was a substantial basis to conclude that evidence of the charged offenses would be found at the Boggston Avenue properties. *See Stearn*, 597 F.3d at 558-60.

Based on the foregoing, the motions to suppress filed by Gemere Bey and Christopher Bradley-Bey are denied.

### c. *Good Faith Exception*

The Government alternatively relies upon the good faith exception to support the constitutionality of the searches and seizures of evidence. (Docket Nos. 1953; 2005). Gemere

Bey contests the application of the good faith exception. (Docket No. 1986). After careful consideration of the parties' arguments, the Court concludes, in the alternative, that the good faith exception would apply in this case if the underlying warrants were invalidated on Constitutional grounds.

The Supreme Court has held that evidence derived from a warrant not supported by probable cause is still admissible when obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate judge. *United States v. Leon*, 468 U.S. 897, 926 (1984). "[T]he purpose of the exclusionary rule-to deter police misconduct—would not be furthered by suppressing evidence obtained during a search 'when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope.'" *United States v. Tracey*, 597 F.3d 140, 150 (3d Cir. 2010) (quoting *Leon*, 468 U.S. at 919–20).

The question is "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922. Indeed, "[t]he mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception." *United States v. Hodge*, 246 F.3d 301, 307-308 (3d Cir. 2001) (citing *Leon*, 468 U.S. at 922). The United States Court of Appeals for the Third Circuit has recognized that the good faith exception does not apply in four limited circumstances:

> 1) where the magistrate judge issued the warrant in reliance on a deliberately or recklessly false affidavit;
>
> 2) where the magistrate judge abandoned his or her judicial role and failed to perform his or her neutral and detached function;

3) where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or

4) where the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Tracey*, 597 F.3d at 151 (citations omitted). These limited exceptions "involve conduct that is 'deliberate, reckless, or grossly negligent.'" *Id.* (quoting *Herring v. United States*, 555 U.S. 135 (2009)).

In this Court's estimation, none of these limited circumstances undermine the assertion of the good faith exception in this case. To this end, the Court has already affirmed the probable cause decision such that the third of the possibilities listed above is inapplicable. Defendants have not argued that either the second or fourth instance; as such, the Court cannot conclude that Magistrate Judge Eddy abandoned her judicial role or that the warrant was facially deficient to particularize the place to be searched or things to be seized. The lone theory that is attempted to be invoked, the first one, requiring reliance upon a deliberately or recklessly false affidavit is further analyzed in the next section and, as the Court explains below, is without merit. Therefore, the Court would alternatively deny the suppression motions as the Government has established that the executing agents relied upon the warrants in good faith on this record.

### d. Gemere Bey's Motion for Franks' Hearing

The final matter for the Court's consideration is Gemere Bey's motion for a *Franks'* hearing, (Docket No. 2066), which is opposed by the Government, (Docket No. 2088). It is well established that a defendant is not entitled to a *Franks* hearing as a matter of right. *See United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006). Rather, as this Court held previously, a defendant must "make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, [and] which is

material to the finding of probable cause." *Yusuf*, 461 F.3d at 383 (citing *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

> In order to make this preliminary showing, the defendant cannot rest on mere conclusory allegations or a "mere desire to cross-examine," but rather must present an offer of proof contradicting the affidavit, including materials such as sworn affidavits or otherwise reliable statements from witnesses.

*Id.* at 383, n.8 (quoting *Franks*, 438 U.S. at 171). If the information presented by a defendant is either not false or not material to the finding of probable cause, then a *Franks* hearing will not be held by the Court. *Id.*

Here, Gemere Bey essentially challenges five statements as false and identifies a series of omissions, all of which he claims entitle him to a *Franks* hearing, but none of these theories convince the Court to exercise its discretion to hold a *Franks* hearing. *See id.* First, Bey contends that the Government has referred to the individual noted as CS2 above using different monikers, (i.e., "CS" or "CS2"), in the search warrant as well as separate warrants served on Facebook. (Docket No. 2066). Second, Bey claims that the statement that CS2 was known and reliable is false because he told the agents that the Facebook threat was made to the account of Camara Bey, which turned out to be incorrect. (*Id.*). Third, Bey argues that the affidavit is false because he could not have met CS2 at Brashear High School due to their disparity in ages of 6 years which demonstrates they did not go to school together, allegedly making the information in the affidavit a factual impossibility. (*Id.*). Fourth, Bey avers that the affiant's statement that drug dealers ""place assets such as vehicles and residences in the names of other persons to conceal their true ownership and the manner in which they were acquired" is false because he placed the two properties in his own name. (*Id.*). Fifth, Bey maintains that the affidavit is false because it states that he was living at one of the Boggston Avenue properties while he points to

other evidence showing he used his parents' 57 Climax Street home as his residence. (*Id.*). Finally, Bey alleges that several omissions from the affidavit render it false and/or misleading including that: he had a permit to carry the firearm that was observed during the November 2014 traffic stop; he was not a participant on any of the thousands of recorded phone calls collected during the investigation; he is not alleged to be a "Zhoove" gang member; he had a job and legitimate income permitting him to afford the Boggston Avenue properties and any renovations thereto; and he was never witnessed on the pole camera engaging in any drug transactions. (*Id.*). Bey presents the Facebook affidavit and information from the County Real Estate website in support. (*Id.*). The Government counters that none of these arguments suffice to warrant the Court convening a *Franks* hearing as the challenged information was neither false nor misleading at the time the statements were made and Bey's alleged arguments otherwise do not undermine the probable cause finding. (Docket No. 2088).

In this Court's opinion, Bey has failed to meet his burden to demonstrate that a *Franks* hearing should be held. *See Yusuf*, 461 F.3d at 383. On the initial points, the Court would note that it has reviewed the two separate affidavits and that any factual discrepancies contained therein can be explained by the simple facts that they were executed by different affiants, Task Force Officer Harpster and Special Agent Johns, and signed on different dates, i.e. May 5 and May 19, 2015. (*See* Docket No. 1953-1; 2066-1). The information regarding the confidential informant appears to the Court to be generally the same, aside from using the different monikers. (*Id.*). But, this discrepancy was neither false nor misleading because the separate warrants were authorized by different judicial officers, i.e., Magistrate Judge Robert C. Mitchell authorized the Facebook search warrant and Magistrate Judge Eddy authorized the search warrants for the residences. (*Id.*). To the extent that Bey contends that the confidential informant provided

inaccurate information about the <u>recipient</u> of his Facebook threat, he has failed to demonstrate that the affiant knew that information was inaccurate at the time and recklessly included it in the affidavit. While Bey focuses on the fact that the Facebook Search warrant was served on Camara Bey's account, the affidavit supporting the search warrant for his properties does not mention the recipient of the Facebook threat by name, only referring to this individual as a member of the family that informant was living with at the time.[11] As the Government confirms in its Response, the information requested under the Facebook warrants were not received until June of 2015 – after the affidavit was signed, and the warrant was executed. (Docket No. 2088). Regardless, the Government confirmed that the threat was sent, it was only directed to a different individual. (*Id.*). This does not suffice to undermine the probable cause finding which is based, in part, on the fact that he sent the threat, not to whom the post was directed.[12]

The next dispute is meritless as the affidavit simply does not state that Bey and CS2 attended high school together; rather, the affidavit explains that his younger brother, Chris Bradley-Bey and CS2 attended high school together and that CS2 "met" Bey at Brashear High School. (Docket No. 1953-1 at 58). Since the high school is undoubtedly a place, where people of all ages can meet, the Court cannot find that information to be false or misleading. (*See*

---

[11]    This portion of the affidavit states:

> *The CS explained that, in or around late January/early February 2015, the CS was residing with a family in Pittsburgh. During that time period, a member of the family the CS was residing with received a Facebook message from Gemere BEY's Facebook account. The CS was informed of the message and reviewed it.
> *The CS is familiar with Gemere BEY's Facebook account and confirmed that the message was sent from Gemere BEY's Facebook account. The CS explained that the message threatened physical harm to the CS as a result of the prior incident. The message also indicated that the family members may be in jeopardy if they continued to allow the CS to reside with them.

(Docket No. 1953-1 at 62).

[12]    The Court recalls that the text of the threat was submitted as an exhibit to the Government's response to his motion for release on bail. (*See* Docket No. 787-2).

Docket No. 2088).  Bey's claim that he was not residing at 190 Boggston at the time of the search warrant affidavit is not credible, as he admitted during the detention litigation including at the hearing held on May 27, 2015, (one week after the warrant), that he should be released on bond to live with his girlfriend at that address.[13]  (Of course, he and his girlfriend were also found in their bedroom upon the execution of the search warrant. (*See* Docket No. 787-3; 787-4)).  The issue as to Bey's placing ownership of the properties in his own name cannot be false or misleading because the affidavit states, unequivocally, that he owns the properties. (*See* Docket No. 1953-1 at 63).  Hence, the Magistrate Judge had this information at the time the warrant was issued and therefore evaluated the alleged discrepancy between the statements concerning drug dealers generally and Bey's own individual activities.

Finally, the Court does not believe that adding any or all of the alleged omissions to the affidavit would change the probable cause calculus in this case.  *See Yusuf*, 461 F.3d at 383.  To reiterate, Bey had already been indicted for drug trafficking and firearms offenses, establishing probable cause to demonstrate that he committed such offenses.  To obtain the search warrant, the Government only needed to show a sufficient nexus that evidence of those offenses would be found at the residences.  *See Stearn*, 597 F.3d at 558-60.  As the Court has explained at length, the determination of probable cause to search Bey's Boggston Avenue properties is well supported in this case.  Accordingly, Bey's motion for a *Franks* hearing is denied.

---

[13]  The Court notes that Gemere Bey's then-counsel argued at the detention hearing: "[t]here are three options for release on conditions for Gemere Bey in this situation: Either his parents, his grandmother, or the current house with his girlfriend who is going to have his child in January at 190 Boggston." (Docket No. 765 at 83).  The Pretrial Services Report dated May 22, 2015 states that his address is 190 Boggston Avenue and that he had been living at this address since May 21, 2014.  *See Bond Report* dated 5/22/15.  This report further advises that the "information was provided by the defendant during an interview conducted on May 21, 2015, and verified by the defendant's mother, Nadia Bey, during a telephone interview conducted on May 22, 2015."  *Id.*

V.    CONCLUSION

Based on the foregoing, the suppression motions filed by Bradley-Bey, Gardenhire and Bey are DENIED.  In addition, the motion for a *Franks* hearing filed by Bey is DENIED.  An appropriate Order follows.


_s/Nora Barry Fischer_
Nora Barry Fischer
U.S. District Judge

Dated: March 24, 2017

cc/ecf: All counsel of record.